FILED
2009 Apr-30  AM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **DEBORAH MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case  No. CV-08-BE-0504-M** |
| | ) | |
| **STANDARD INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on "Motion for Summary Judgment on Defense of Preexisting Conditions" filed by Plaintiff (doc. 13); "Defendant Standard Insurance Company's Motion for Summary Judgment" (doc. 17); "Defendant's Response to Plaintiff's Motion for Summary Judgment and Motion to Strike Morgan Affidavit" (doc. 22); and Plaintiff's "Motion to Strike Exhibit B to Second Affidavit of Mary E. Cea" (doc. 25).  Plaintiff brought this suit because of a dispute over Standard Insurance Company's application of a preexisting condition exclusion in an ERISA-governed group long-term disability insurance benefits policy that Standard issued to Plaintiff's former employer.  The parties have stipulated that the court may resolve this matter finally on the cross-motions for summary judgment based on the record. (doc. 19).

For the reasons stated in this Memorandum Opinion, the court will DENY Plaintiff's motion for summary judgment, GRANT Defendant's motion for summary judgment, GRANT Defendant's motion to strike, and DENY Plaintiff's motion to strike.

The court notes that it would normally address the motions to strike at the outset.

However, the ERISA case law makes clear that the court should first determine which standard of review applies to the instant case, because that decision affects what documents the court may consider as relevant evidence. *See, e.g., Kirwan v. Marriott Corp.*, 10 F.3d 784, 789-90 (11th Cir. 1994) (stating that the court conducting a *de novo* review may consider evidence, such as a subsequent social security disability determination, that was not part of the administrative record); *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (stating that when conducting an ERISA benefits denial review under the arbitrary and capricious standard, the court looks "to the facts known to the administrator at the time the decision was made"). Accordingly, the court's initial task is to determine the appropriate standard of review.

<u>Standard of Review</u>

"ERISA does not set out standards under which district courts must review an administrator's decision to deny benefits." *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1355 (11th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). In light of that silence, the Supreme Court has provided guidance for what review is appropriate, focusing on what authority the ERISA-governed plan confers upon the plan administrator. Where the plan expressly confers discretionary authority to determine eligibility or construe the terms of the plan, the district court should review benefit decisions under an arbitrary and capricious standard; however, where administrators have no such authority, the court should conduct a *de novo* review. *Firestone*, 489 U.S. at 111, 115. To determine whether the ERISA plan grants to the administrator discretionary authority, the court looks to the relevant group policy and the summary plan description, "which together make up the ERISA plan, for purposes of 29 U.S.C. § 1102(a)(1)." *Wilcox v. The Standard Ins. Co.*, 340 F. Supp. 2d 1266, 1270 (N.D. Ala. 2004) (citing *Shaw v. Conn. Gen. Life Ins. Co.* 353 F.3d 1276 (11th Cir. 2003)).

In the instant case, the group policy issued to Plaintiff's employer provides in its "Allocation of Authority" section that, except where the policy expressly reserves functions, Standard has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." (doc. 17-2, at 26). The policy further provides that Standard's authority includes:

1. The right to resolve all matters when a review has been requested;

2. The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3. The right to determine:
   a. Eligibility for insurance;
   b. Entitlement to benefits;
   c. The amount of benefits payable; and
   d. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

*Id.* The Certificate and Summary Plan Description echoes this language. (doc. 23-2, at 33). [1]

---

[1] In her motion to strike, Plaintiff points out that the documents attached as Exhibit B to Mary E. Cea's second affidavit, which include the Certificate and Summary Plan Description, were not in the claims file and have not been produced to Plaintiff. The court will discuss Plaintiff's objections further under the section entitled "Plaintiff's Motion to Strike." At this point in the discussion, the court simply notes that regardless of whether the Certificate and Summary Plan Description was produced to Plaintiff, that document is relevant evidence that the court may consider, at least for the specific purpose of determining what authority the plan conferred upon Standard as the plan administrator. Because the "Allocation of Authority" language in the Certificate and Summary Plan Description is identical to that of the policy, which Plaintiff acknowledges receiving in the claims process, Plaintiff cannot reasonably argue that she was surprised by this language in the Certificate and Summary Plan Description. Indeed, in "Plaintiff's Reply in Support of Motion to Strike," she acknowledges the identical language and "withdraws all arguments regarding the Allocation of Authority." (doc. 32, at 2).

A district court sitting within the Eleventh Circuit's purview has analyzed this same language and determined that it conferred discretionary authority to the plan administrator sufficient to invoke the "arbitrary and capricious" review of benefits decision. *See, e.g., Wilcox*, 340 F. Supp. 2d at 1270 n. 1 & 1278. The Ninth Circuit has also analyzed practically identical policy language[2] and determined that it "grants the necessary discretion to the plan administrator." *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 33 Fed. App'x. 908, 909 (9th Cir. 2002) (citing *Bendixen v. Standard Ins. Co.*, 185 F.3d 939 (9th Cir. 1999)).

Although not bound to follow these decisions, this court agrees with their conclusions, and notes that the Plaintiff has pointed this court to no case law, controlling or otherwise, that has addressed the policy language and found that it does *not* confer discretionary authority upon the plan administrator. When an ERISA plan explicitly vests its administrator with the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a district court should conduct an review under the arbitrary and capricious standard. *Firestone*, 489 U.S. at 115. In the instant case, the plan explicitly bestows upon the plan administrator "full and exclusive" authority to control, administer claims, and *interpret the policy*. It explicitly granted the administrator powers, such as the right to determine *entitlement to benefits*, recognized to be discretionary. *See, e.g., Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 964 n. 3 (9th Cir. 2006) (citing with approval the holding "that a plan conferred discretion so long as it gave the company the power to determine eligibility for benefits" stated in *Elev v.*

_____

[2]The Standard policy language quoted in *Bendixen* contained the same language as the policy language quoted in the instant case, except that 3a. included the word "your" before eligibility and 3b. included the word "your" before entitlement. 185 F.3d at 943 n. 1. The *Ehrensaft* opinion did not quote the policy language, but stated that the policy language was identical to that in *Bendixen*. 33 Fed. App'x at 909.

*Boeing Co.*, 945 F.2d 276, 278 & n. 2 (9th Cir. 1991)).  Accordingly, this court finds that the

plan explicitly granted discretionary authority to Standard to determine eligibility for benefits,

and thus, this court will conduct any review of such a determination under the "arbitrary and

capricious" standard.

    Standard acknowledges that it functions as both the claims evaluator and the claims payer

and further acknowledges that, according to the United States Supreme Court's recent decision of

*Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350-2352 (2008*)*, it operates under an

inherent conflict of interest in making claims determinations.  (Def's Br., doc. 18 at 17 n. 4).  As

the Supreme Court specified in *Glenn*, this court will consider that conflict of interest as one

factor to take into account when determining whether Standard's decision was arbitrary or

capricious.  *See Glenn*, 128 S.Ct. at 2350-51 (citing *Firestone*, 489 U.S. at 111-115); *Doyle*, 542

F.3d at 1360 (holding that *Glenn* implicitly overruled Eleventh Circuit precedent imposing a

*heightened* arbitrary and capricious standard where plan administrators operated under conflicts,

and further holding that such a conflict "should merely be a factor for the district court to take

into account").

<u>Defendant's Motion to Strike</u>

    Defendant moves the court to strike the "Affidavit of Deborah B. Morgan" (doc. 13-2),

filed in support of her motion for summary judgment, because this affidavit introduces

information that was not part of the administrative record when the plan administrator rendered

its decision, and because Plaintiff has filed no motion to re-open the administrative record.  In

cases applying the arbitrary and capricious standard to the review of the insurer's decision to

deny benefits, the court generally looks only to the record before the insurer at the time it made

its decision.  *See, e.g., Buckley v. Metro. Life*, 115 F.3d 936, 941 (11th Cir. 1997); Jett, 890 F.2d at 1139 (both applying the arbitrary and capricious standard).

In the instant case, the court will conduct a review of Standard's decision under the arbitrary and capricious standard, and in determining whether a reasonable basis exists for that decision, the court will endeavor to look only to the record before Standard at the time of its decision.  However, the court notes that exactly what documents were part of the record is far from clear; Mary Cea's first affidavit (doc. 17-2) acknowledges that she only attaches "excerpts" from the administrative claim file because the entire claim file is more than 500 pages long.  In any case, the court recognizes that Standard denied Morgan's claim in a letter dated August 14, 2007 and upheld that decision on review in a letter dated February 12, 2008.  Morgan's affidavit dated July 7, 2008 could not have been included in the documents upon which Standard based its decision.  Accordingly, the court will GRANT the motion to strike to this extent: in reviewing Standard's decision to deny Morgan's claim, the court will look only to the facts known to Standard at the time of the denial and the internal review upholding that decision, and will not look to the facts in Morgan's subsequent affidavit.

<u>Plaintiff's Motion to Strike</u>

Morgan also filed a motion to strike, asking the court to strike Exhibit B to Mary E. Cea's second affidavit because that exhibit contains documents that were not in the claims file and were not produced to Morgan.  Those Exhibit B documents include correspondence between Standard and Morgan's employer, purporting to enclose a supply of certificates summarizing the policy coverage and requesting the employer to distribute them to all employees,  as well as a sample "Certificate and Summary Plan Description Group Long Term Disability Insurance" with

6

an effective date of April 1, 2004.

The parties spend much effort arguing for and against the inclusion of these documents, because they affect the issue of whether Morgan received notice of the policy provisions, including the provision excluding preexisting conditions.  Despite the parties' efforts, the court sees little relevance in that issue.  Under ERISA law, the plan administrator does indeed have a duty under 29 U.S.C. §§ 1022(a), 1024(b) to furnish plan participants and beneficiaries a summary plan description to notify them of policy provisions but Morgan's complaint, as amended, does not allege such a violation.  Even assuming *arguendo* that the Amended Complaint does allege such a violation, Morgan has provided this court with no controlling case law – and this court is aware of none – supporting a position that an ERISA  plan administrator's failure to provide employees with a summary plan description prevents the plan administrator from asserting an otherwise valid policy exclusion.[3]  Accordingly, the notice issue is not material

_____

[3]As Morgan pointed out during the claims process and in her brief supporting her motion for summary judgment, Alabama law does provide that an insurer who has not mailed or delivered an insurance policy to the insured may be estopped from asserting an otherwise valid coverage exclusion if the insured suffered resulting prejudice.  *See* Ala. Code § 27-14-19 (1975) (requiring that insurers mail or deliver a policy to the insured); *Brown Mach. Works & Supply, Inc. v. Ins. Co. of N. Am.*, 659 So.2d 51, 61 (Ala. 1995) (finding in a non-ERISA case that an insurer who does not comply with § 27-14-19 may be estopped from asserting an otherwise valid exclusion in the policy, when the insured suffers resulting prejudice).  However, Alabama law does not control in this instance; this court agrees with the decision of Magistrate Judge Davis, sitting in this district, finding that the Alabama statute conflicts with ERISA requirements, and thus, ERISA preempts it.  *Wilcox*, 340 F. Supp. 2d 1266, 1277 (N.D. Ala. 2004) (citing *Boggs v. Boggs*, 520 U.S. 833, 841 (1997)).   Morgan's counsel should be well aware of this preemption and its effect on the Alabama law's applicability, because he was the counsel for the plaintiff in *Wilcox*. In any case, the court notes that a careful reading of the *Brown Mach. Works* case does not support Morgan's position, because that case involved distinguishable facts – the policy the insurer failed to deliver was not a group policy or an ERISA-governed policy – and because the court acknowledged in *dicta* that beneficiaries under a group policy "are probably excluded" from the persons/entities entitled to copies of the policy under the statute.  659 So.2d at 60.

to the motions for summary judgment.

The court notes that Exhibit B contains a plan document, the Certificate and Summary Plan Description, that is relevant to its determination of the appropriate standard of review in this case, as discussed previously.  In light of the summary plan's relevance to the standard of review determination, the fact that the relevant language in both the policy and summary plan is the same, and the immateriality of the notice issue, the court, in its discretion, will DENY Plaintiff's motion to strike Exhibit B.

<u>Cross Motions for Summary Judgment</u>

Both Plaintiff's and Defendant's Motions for Summary Judgment focus on Standard's application of the preexisting condition exclusion in denying Plaintiff's claim. The parties agree that the following facts are correct.

A. *Facts*

Standard issued an ERISA-governed group long-term disability policy to Porterfield Harper Mills & Motlow, P.A. ("Porterfield"). On March 13, 2006, the Plaintiff, Deborah Morgan, became an employee of Porterfield, and her coverage became effective under that group policy.  Porterfield paid 100% of Morgan's group disability insurance premium.

The policy Standard issued to Porterfield contains the following exclusion:

**DISABILITIES EXCLUDED FROM COVERAGE**

C. Preexisting Condition

1. Definition
   Preexisting condition means a mental or physical condition whether or not diagnosed or misdiagnosed:

   a. For which you have done or for which a reasonably prudent person would have

done any of the following:

> (i)    Consulted a physician or other licensed medical professional;
> (ii)   Received medical treatment services or advice;
> (iii)  Undergone diagnostic procedures, including self-administered procedures;
> (iv)  Taken prescribed drugs or medications;

b.  Which, as a result of any medical examination, including routine examination, was discovered or suspected;

at any time during the 90-day period just before your insurance becomes effective.

2.  Exclusion

You are not covered for a Disability caused or contributed to by a Preexisting Condition or medical or surgical treatment of a Preexisting Condition unless, on the date you become Disabled, you:

a.  Have been continuously insured under the Group Policy for 12 months; and

b.  Have been Actively at Work for at least one full day after the end of that 12 months.

With respect to Morgan, the 90-day period relevant to the preexisting condition provision began on December 13, 2005 and ended on March 12, 2006, the day before her coverage became effective.  On December 5, 2005, eight days before the 90-day period began, Morgan visited her primary treating physician, Dr. Ross Bishop, and Dr. Bishop's records indicate a diagnosis of "hypertension" and stated that she was on a "3-drug hypertension" regimen.  (doc. 17-2, at 76).  On February 21, 2006, within the 90-day period, Morgan filled a prescription for Corzide, a drug to treat high blood pressure that she had previously taken in 2005.  On February 23, 2006, Dr. Bishop treated Morgan for arthralgia (pain in the joints) of the hands, and his treatment notes stated that Morgan "has hypertension and has been taking a lot of Advil and noticed her pressure went up, so stay away from the Advil."  (doc. 17-2, at 76).

On May 9, 2005, two months after the 90-day period ended, Morgan was admitted to the

hospital and Dr. Bishop described her in hospital records as having "a history of . . . severe hypertension." (doc. 17-2, at 78).

On December 19, 2006, just over nine months after Morgan's policy coverage became effective, Morgan suffered a stroke. Following her stroke, Morgan applied for disability benefits under her policy, claiming that she was disabled from work because of the effects of her stroke.

Because her disability insurance had been in effect for less than twelve consecutive months at the time she ceased work, Standard reviewed her claim to determine whether the preexisting condition exclusion applied. As part of the claims evaluation process, Standard sent Morgan's file to Dr. Elias Dickerman, a physician consultant board certified in neurology. Based on his review of Morgan's medical records, Dr. Dickerman noted Morgan's "chronic, poorly controlled history of high blood pressure" and opined that "her history of hypertension is quite significant and was certainly one of the contributors to the patient's CVA. What cannot be stated with certainty is whether the hypertension was, in fact, the cause of the CVA, but there is no question that it was a significant contributor to the CVA." (doc. 14, Ex. 3).

Dickerman's report also included a note to clear up what he characterized as a "misunderstanding" reflected in the notes of Thea Snyder, a case manager for Standard. Snyder's "Case Notes" dated April 11, 2007 and relating to an April 10, 2007 conversation with Dickerman, contained the following ambiguous statement: "Despite the difficulty in determining what medications [Morgan] was on [during the 90-day period prior to insurance coverage], Dr. Dickerman felt that the clmts history of hypertension was the cause nor contributor to the clmt's CVA." (doc. 23-2, at 4). The word "not" was added in handwriting between the phrases "history of hypertension was" and "the case nor contributor" with Thea Snyder's initials and a date, but

10

no initials or signature of Dickerman.  To the extent that Snyder's case note purported to record Dickerman's opinion that hypertension was *not* a contributor to Morgan's stroke, Dickerman stated that Snyder had misunderstood. (doc. 14, Ex. 3).

Standard received Morgan's hospital records as part of the claims process.  One of Morgan's physicians, Dr. Willbon Bates, noted in the hospital records that Morgan had a history "remarkable for hypertension" and noted "poorly controlled" and "elevated" blood pressure and headache in the two weeks immediately preceding the stroke.  (doc. 17-2, at 65).  Dr. Bates recorded the following assessment in her chart: "Acute cerebrovascular accident [stroke] left middle cerebral artery distribution, probably secondary to a hypertensive [high blood pressure] cerebrovascular accident."  (doc. 17-2, at 69-70).  Dr. Bates's assessment also included notations that her hypertension was recently poorly controlled, that her non-insulin dependent diabetes was controlled, and that she suffered from hypothyroidism.  Morgan's hospital chart indicates that shortly after her stroke, Morgan's blood pressure was high (157/105), and further records a statement Morgan's husband made that her blood sugar had been on the "low side" prior to the stroke.  (doc. 17-2, at 68).

In a letter dated August 14, 2007, Standard denied Morgan's claim because her stroke was caused by or contributed to by her history of hypertension and thus, was excluded under the policy's preexisting condition exclusion. Although Standard had not yet received the pharmacy records for the 90-day period, the regulatory time frame required that the company make a decision on the claim based on the information available.  Standard's denial letter stated that the exclusion applied because Dr. Bishop had treated Morgan for conditions, including hypertension, during the weeks and months just prior to the 90-day period and because Morgan had "self-

11

reported taking medications for these conditions throughout the 90 day period  . . . .  Therefore, it is reasonable to conclude that a reasonably prudent person would have continued taking these medications during this period."  (doc. 17-2, at 56).   The letter advised Morgan of her right to appeal the decision.

Standard's record stamped "Sep. 6, 2007" and entitled "CVS Pharmacy Patient Prescription Record between 12/01/2005 and 3/03/06 Pharmacy #4950" reflects that Morgan filled prescriptions for various medications, including "Corzide 40/5 Tablet" on 2/21/06 prescribed by Dr. Bishop.  (doc. 17-2, at 63).

In a letter dated September 13, 2007, Morgan's counsel appealed Standard's denial of Morgan's claim, and in that letter also requested the claims file, denied that Morgan ever received a copy of the policy, and asserted that her failure to receive a copy of the policy violated Alabama law.  Standard sent Morgan's counsel a copy of the claims file.  In a letter dated November 15, 2007, Morgan's counsel wrote Standard, advising that Morgan had no additional evidence to submit.  He also argued that the preexisting condition defense must fail because Standard could not prove that Morgan's stroke was caused by or directly attributable to high blood pressure, and further, because Morgan had never received notice of the preexisting condition exclusion.

On December 20, 20007, Standard wrote Morgan's counsel to advise him that the company had concluded a preliminary review of the claims denial, had concluded that the denial was correct, and had forwarded Morgan's file to its Administrative Review Unit.  On December 28, 2007, the unit referred the file to Dr. Bradley Fancher, a physician consultant board certified in internal medicine. On January 17, 2008, Dr. Fancher's report stated that

12

> [t]he claimant's cerebrovascular accident can be reasonably assumed to be caused or contributed to by the claimant's hypertension because of 1) the absence of other risk factors; 2) the claimant's severe, prolonged and uncontrolled hypertension; 3) the preceding history of the headache and elevated blood pressure for two weeks prior to her event; 4) the absence of any evidence of embolic episode (her cardiac echo was normal).

(doc. 17-2, at 62). The consultant's report also concluded that Morgan's medical records did not "support a contention that claimant's cerebrovascular accident was caused by or contributed to by something other than her hypertension," ruling out other major risk factors such as smoking, hyperlipidemia, and diabetes. (doc. 17-2, at 61-62).

In a letter to Morgan dated February 12, 2008, Standard upheld on administrative review the decision to deny disability benefits to Morgan on the basis of the preexisting condition exclusion, finding that her hypertension was a preexisting condition that contributed to her stroke. Standard did not make a determination whether Morgan was disabled or whether she would be entitled to benefits if the preexisting condition exclusion did not apply. Standard sent Morgan's counsel a copy of the remainder of the claim file generated during the administrative review process. On February 27, 2008, Morgan filed the instant lawsuit, alleging a claim for disability benefits under ERISA.

B. *Discussion*

Prior to the Supreme Court's decision of *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008), the Eleventh Circuit had established a six-step framework for reviewing the decision of an ERISA plan:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

13

(2)  If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)  If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)  If there is no conflict, then end the inquiry and affirm the decision.

(6)  If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecomm., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004) (emphasis in original; footnotes in original omitted), *implied overruling recognized by Doyle*, 542 F.3d 1352 (11th Cir. 2008).  The Eleventh Circuit has acknowledged that the *Glenn* decision implicitly overruled its use of the heightened arbitrary and capricious standard and thus, step six no longer exists.  *Doyle*, 542 F.3d at 1359.  However, this court is left with questions whether the Eleventh Circuit will continue to analyze ERISA cases using the first five steps in the framework.  Another district court sitting in this circuit acknowledged that the *post-Glenn* use of this framework, even when truncated to the first five steps, was open to debate.  *See Scippio v. Fla. Combined Life Ins. Co.*, 585 F. Supp. 2d 1317, 1328 (N.D. Fla. 2008).  That court concluded that "*Glenn* probably does not abrogate the entire Eleventh Circuit framework" and proceeded to use that framework through step five.  *Id.*  This court agrees with that conclusion; until the Eleventh Circuit provides further guidance on this issue, the court will continue to use the framework up to the point that the framework conflicts with the *Glenn* decision.

14

Accordingly, the court's first step is to apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong." " The court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." *Glazer v. Reliance Standard Ins. Co.*, 524 F.3d 1241, 1246-7 (11th Cir. 2008). If the court agrees with the administrator's opinion, then the analysis ends and the decision is affirmed. *Id.*

The court notes that Standard's failure to submit the complete claim file complicates the court's review of the evidence in the administrative record. The court should have access to all the documents in the record and should not have to wonder what information is reflected in the administrative record documents that Standard chose not to submit to the court. However, Morgan's counsel apparently did have access to the complete claim file/administrative record, and had the opportunity to submit any additional documents to the court that might be relevant and material. The two motions to strike indicate that counsel for both sides were aware of the importance of identifying what items were and were not part of the administrative record. Accordingly, the court will assume that the submissions reflect all relevant and material documents in the administrative file, subject to the objections set forth in the motions to strike. Thus, the court did not take into consideration the facts listed in Morgan's affidavit, to which Defendant objected because Plaintiff submitted it after both the initial denial of Morgan's claim and the decision upholding that denial after administrative review.

Having reviewed *de novo* the evidence before the plan administrator, the court agrees with the administrator's decision that Morgan's hypertension was a preexisting condition that substantially contributed to her stroke and thus, was excluded under the policy's preexisting

15

condition exclusion.  The preexisting condition exclusion contains two relevant time periods for its application.  First, the exclusion applies only if the alleged disability occurs within the 12-month period immediately *following* the coverage effective date. Morgan does not dispute that the stroke, which she characterizes as disabling, occurred within a year of her March 2005 coverage effective date.   The exclusion's second relevant time period focuses on the 90-day period immediately *preceding* the coverage effective date, in this case December 13, 2005 to March 12, 2006.  If the relevant condition manifested itself during this time period as set forth in the policy, then the condition meets the definition of "preexisting."

The evidence in the administrative record reflects that on February 21, 2006, within the 90-day period, Morgan filled a prescription for Corzide, a drug to treat high blood pressure.  It also reflects that on February 23, 2006, Dr. Bishop treated Morgan's hypertension during an office visit; Dr. Bishop advised her to stop taking Advil because it increased her blood pressure.  Thus, the evidence reflects that within the relevant 90-day period, Morgan received medical treatment and advice for her hypertension and took a prescribed drug for her hypertension.  Her hypertension, therefore, meets part a. (i), (ii), and (iv)[4] of the policy definition of "preexisting."

Because the definition contains no conjunction between part a. and part b., the court must

---

[4]Preexisting condition means a mental or physical condition whether or not diagnosed or misdiagnosed:
    a.  For which you have done or for which a reasonably prudent person would have done any of the following:
          (i)      Consulted a physician or other licensed medical professional;
          (ii)     Received medical treatment services or advice;
          . . .
          (iv)    Taken prescribed drugs or medications;
. . .
at any time during the 90-day period just before your insurance becomes effective.

16

assume that both parts are necessary to the definition.  The court finds that Morgan's hypertension also meets part b.[5] of the definition, because Dr. Bishop's February 2006 notes refer to her hypertension and he prescribed a drug during that month to treat her hypertension; thus, he had certainly discovered and/or suspected that she had hypertension based on a routine examination.[6]

Having determined that Morgan's hypertensive condition met the policy definition of "preexisting condition," the court must also determine whether her hypertension caused or contributed to her disability, and thus, falls within the policy exclusion.

In the hospital records related to Morgan's stroke, her treating physician made the following assessment: "Acute cerebrovascular accident left middle artery distribution, *probably secondary to a hypertensive cerebrovascular accident.*" (doc. 17-2, at 69-70) (emphasis added). He noted that her hypertension recently had been poorly controlled and recorded a blood pressure

---

[5] Preexisting condition means a mental or physical condition whether or not diagnosed or misdiagnosed:
. . .
b.  Which, as a result of any medical examination, including routine examination, was discovered or suspected;
at any time during the 90-day period just before your insurance becomes effective.

[6] 2.  Exclusion
You are not covered for a Disability caused or contributed to by a Preexisting Condition or medical or surgical treatment of a Preexisting Condition unless, on the date you become Disabled, you:

a.  Have been continuously insured under the Group Policy for 12 months; and

b.  Have been Actively at Work for at least one full day after the end of that 12 months.

reading shortly after the stroke of 157/105.  Both of Standard's medical consultants, one a neurologist and another an internist, agreed that Morgan's hypertension either caused or contributed to her stroke.  Dr. Dickerman, the neurologist, opined that "there is no question that [the hypertension] was a significant contributor to the CVA."  (doc. 14, Ex. 3).  Although Morgan argued that Dickerman first found that Morgan's hypertension was NOT the cause of her stroke and then changed his opinion, the court finds no support for this argument in the administrative record.  Dickerman's report clearly set out his finding that Morgan's hypertension was a significant contributor to her stroke, and nothing prepared by Dickerman varies from that finding.  Morgan based her argument not on any report prepared by Dickerson, but rather, on the notes of a conversation with Dickerman prepared by Standard's case manager, Thea Snyder.  To the extent that Thea Snyder's confusing notes of her conversation with Dickerman reflect otherwise, Dickerman expressly stated that she had misunderstood him.

Dr. Fancher, the reviewing internist, ruled out other major risk factors as causes of Morgan's stroke.  As Standard points out in its opposition brief, no medical opinion contradicts Standard's determination that Morgan's pre-existing condition of hypertension caused or contributed to her stroke.  Morgan has certainly provided no medical evidence to the contrary. Therefore, the court finds that the administrative record, including Morgan's medical records and Standard's reports from consulting physicians, reflects that Morgan's pre-existing condition of hypertension caused or significantly contributed to her stroke on December 19, 2006.  Thus, the court agrees with the administrator's decision.

Having found that the administrator's decision is "*de novo* right," the court need not proceed to the remaining steps in the Eleventh Circuit's framework.  However, the court notes

18

that if it were to review the decision under the more deferential arbitrary and capricious standard, taking into account the administrator's conflict of interest as one factor to consider *(see Glenn* 128 S.Ct. at 2351-52), it would nevertheless reach the result that the administrator's decision was not arbitrary or capricious; reasonable grounds exist for the decision, as outlined above.

The court acknowledges Morgan's arguments in her briefs that the preexisting exclusion is unenforceable against Morgan because it is overly broad and vague, and because Morgan had no notice of it.  In so arguing, Morgan focuses on the exclusion's language "contributed to."  She appears to assert that the exclusion is ambiguous, because it does not require that the preexisting condition *substantially* contributed to the disability.

This court need not decide whether the language is ambiguous, because the result in this case is the same.  Even if the language were ambiguous, ambiguity does not automatically render the contract provision unenforceable.  Rather, if ambiguity exists, the doctrine of *contra proferentem* requires that the provision be construed against the drafter.  *Billings v. UNUM Life Ins. Co. of Am.*, 459 F.3d 1088, 1094-95 (11th Cir. 2006).  Thus, even if Morgan's argument regarding ambiguity had succeeded, the most that she would have gained would be the construction of the exclusion against the drafter, *not* its unenforceability.  Assuming *arguendo* that the exclusionary language is ambiguous and accepting *arguendo* Morgan's argument that the language should be construed as requiring the preexising condition to *substantially contribute to* Morgan's stroke, the court would nevertheless find the administrator's decision to be correct; Standard has met that burden.  *See Dixon v. Life Ins. Co. of N. Am.*, 389 F.3d 1179, 1184 (11th Cir.  2004 ) (addressing different policy language and adopting the "substantially contributed" test).  The medical records reflect that Morgan's hypertension was a "significant" contributor to

19

Morgan's stroke.  Merriam-Webster's Dictionary defines "significant" as "important. . .having great meaning or lasting effect. . . of noticeably or measurably large amount."  It defines "substantial" as "important. . .considerable in quantity."  Roget's Thesaurus lists "substantial" as a synonym for "significant." Further, Dr. Fancher's opinion, discounting all of Morgan's other major risk factors *except* her hypertension, supports the substantiality of the hypertension as a contributing factor. Accordingly, the medical records support a finding that Morgan's hypertension substantially contributed to her stroke.

Morgan's final argument against the enforceability of the exclusion focuses on her lack of notice.  She claims that, before the stroke, she did not receive the Certificate and Summary Plan Description or other notice of the preexisting condition exclusion, and thus, Standard is estopped from denying coverage based on that exclusion.  She further claims that when her attorney raised the notice issue during the claims process, Standard did not provide the Exhibit B documents supporting the provision of notice and its submission of those documents for the first time in a reply brief surprised and prejudiced her.

However, as noted previously in this opinion, Morgan has provided this court with no controlling case law – and this court is aware of none – supporting Morgan's position that an ERISA plan administrator's failure to provide employees with a summary plan description prevents the plan administrator from asserting an otherwise valid policy provision.  *See* discussion *supra*, pp. 7-8 & n. 3.  Because Morgan's complaint does not claim that Standard violated its duty under 29 U.S.C. §§ 1022(a) and 1024(b) to furnish plan participants and beneficiaries a summary plan description to notify them of policy provisions, the court need not make a ruling on whether Standard violated this duty.

In summary, the court finds that the preexisting condition exclusion is enforceable, and that Morgan's hypertension was a preexisting condition that caused or substantially contributed to her stroke, and thus, falls within the preexisting condition exclusion in question.  Therefore, the court finds that Standard's denial of coverage was *"de novo* right."  Of course, under the more deferential "arbitrary and capricious" standard, the court would also affirm Standard's denial of coverage; noting Standard's conflict of interest as one factor to be taken into account, the court finds that reasonable grounds exist for that decision, and thus, it is neither arbitrary nor capricious.

Conclusion

Therefore, the court will DENY Plaintiff's Motion for Summary Judgment (doc. 13); and GRANT Defendant's Motion for Summary Judgment (doc. 17).  Because of the parties' stipulation that the court may resolve this case finally based on these motions (doc. 19), the court will ENTER, simultaneously with this opinion, a FINAL JUDGMENT in this case against the Plaintiff and in favor of the Defendant.

Further, the court will DENY Plaintiff's Motion to Strike (doc. 25) and will GRANT Defendant's Motion to Strike (doc. 22) to this extent:  in reviewing Standard's decision to deny Morgan's claim, the court looked only to the facts known to Standard at the time of the denial and the internal review upholding that decision, and did not look to the facts in Morgan's subsequent affidavit.

Dated this 30th day of April, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE